UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA HURREN,

      Plaintiff,                    Civil Action No. 19-11790

v.                              HON.  MARK A. GOLDSMITH
                                  U.S. District Judge
COMMISSIONER OF SOCIAL      HON. R.  STEVEN WHALEN
SECURITY,

      Defendant.
_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff  Melissa Hurren brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  Plaintiff has filed a motion for summary judgment or remand and Defendant has filed a motion for summary judgment, both of which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Plaintiff's Motion for Summary Judgment or Remand  [Docket #10] be GRANTED to the extent that the case be remanded to the administrative level for further proceedings consistent with this Report.  I recommend that Defendant's Motion for Summary Judgment [Docket #11] be  DENIED.

## I.  PROCEDURAL HISTORY

On October 17, 2014, Plaintiff filed an application for SSI, alleging disability as of April 1, 2008  (Tr. 168).  After the initial denial of the claim, Plaintiff requested an administrative hearing, held on October 5, 2016 in Oak Park, Michigan before Administrative Law Judge ("ALJ") Virginia Herring (Tr. 34).  Plaintiff, represented by attorney Deirdre Madden, testified (Tr. 40-71), as did Vocational Expert ("VE") Judith Findora (Tr. 72-77).  On November 25, 2016, ALJ Herring found that Plaintiff was not disabled (Tr. 18-29).  On April 23, 2019, the Appeals Council denied review of the claim (Tr. 1-3).  Plaintiff filed for judicial review of the final decision June 17, 2019.

## II. BACKGROUND FACTS

Plaintiff, born January 19, 1976, was 40 when the ALJ issued her decision (Tr. 29, 168).  She completed one year of college and worked previously as a machine operator  (Tr. 192-193).  She alleges disability due to a broken right foot, right knee injury, herniated discs, fibromyalgia, sciatica, arthritis, anxiety, and depression (Tr. 191).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

She was right-handed (Tr. 41).  She stood 5' 6" and weighed 205 pounds (Tr. 40-41). She lived in Macomb, Michigan with her boyfriend and 12-year-old daughter (Tr. 41).  Her boyfriend, who was retired, paid the household bills (Tr. 41-42).

Plaintiff had a driver's license but limited her driving to taking her daughter to a nearby school bus stop (Tr. 42-43). Plaintiff relied on her boyfriend to drive her to doctor's appointments and the grocery store (Tr. 43). She did not take public transportation because when her boyfriend was not available, she was driven by other individuals (Tr. 43).

Plaintiff attributed her disability to a broken foot resulting from a January, 2004 car accident (Tr. 44). She underwent three foot surgeries following the accident (Tr. 44). She had been advised to apply for disability but nonetheless continued to work (Tr. 44).

At the time of hearing Plaintiff experienced constant arm, back, and leg pain, which was exacerbated by activity (Tr. 49). She took Norco and Amitriptyline for the body pain but nonetheless experienced level "eight" pain on a scale of one to ten (Tr. 49). She believed that her body was immune to pain medication (Tr. 50).

Plaintiff experienced foot swelling and knee pain (Tr. 51). She had not undergone surgery on her knee (Tr. 51). She had a laminectomy in January, 2015[1] (Tr. 52). As a result of the surgery, her condition improved for less than five months, after which time she was referred to a pain management specialist (Tr. 53). She smoked one pack of cigarettes over the course of one to three days  (Tr. 53). She had tried unsuccessfully to quit smoking (Tr. 53-54).

---

[1]The treating records show that the laminectomy was actually performed in September, 2013 (Tr. 343-344).

Plaintiff typically retired at 9:00 p.m. and arose at 6:00 a.m. (Tr. 54, 56). She experienced interrupted sleep due to pain (Tr. 55). She coped with the nighttime pain by sleeping on the floor (Tr. 56). She slept intermittently over the course of the day due to interrupted nighttime sleep (Tr. 56). When asked by the ALJ why she did not strive to stay awake during the day, Plaintiff stated that she was unable to reverse her sleep cycle (Tr. 59). On a typical day, Plaintiff arose, made coffee, and took her daughter to the bus stop (Tr. 60). After leaving the bus stop, Plaintiff would either go to a doctor's appointment or the grocery store, after which time she would come home and sleep (Tr. 60). During her shopping trips, she used a regular shopping cart which she used to support herself (Tr. 60). Plaintiff used an inhaler at times that she became upset (Tr. 62). She experienced coughing episodes around twice a week (Tr. 62).

Plaintiff saw a psychiatrist once a month but did not otherwise receive mental health therapy (Tr. 64). She also attributed her inability to work to depression and anxiety caused by the car accident and her resulting physical limitations (Tr. 64-65). She limited her social interaction to family members and even became overwhelmed when family members visited in larger groups (Tr. 65). Plaintiff was able to walk for 15 minutes with the use of a shopping cart (Tr. 65). She could sit for up to 25 minutes without requiring a position change (Tr. 66).

In response to questioning by her attorney, Plaintiff reported that she alleviated foot swelling by elevating her leg (Tr. 67).  When she slept, she used a pillow to keep the leg elevated (Tr. 68).  Epidural steroid injections relieved her pain for no more than three days (Tr. 68).  She experienced pain relief only while sleeping (Tr. 68).  She had poor upper body strength, but did not experience significant problems with fine manipulative activity (Tr. 69).  She was unable to bend over to tie her own shoes or put on boots  (Tr. 71).

### B.    Medical Evidence

#### 1.  Treating Sources[2]

Records by Michael Drelles, D.O. note that Plaintiff underwent a series of steroid injections between April, 2013 and February, 2015 (Tr. 81).  May, 2013 physical therapy discharge records note that after 12 visits, Plaintiff's functional abilities were "poor" and that she experienced difficulty turning her head, pulling, pushing, and other exertional and non-exertional functioning (Tr. 233).  Plaintiff reported that she used a motorized cart for grocery shopping and was not driving, vacuuming, or sweeping (Tr. 261).  In September, 2013, a partial laminectomy and discectomy at L5-S1 was performed by Assadollah Mazhari, M.D. (Tr. 343-344).  An MRI from the next month showed disc protrusion changes at L5-S1 and

---

[2]

In an application for SSI, the relevant period is the date of the application through the date of the ALJ's determination. *See Roberts v. Colvin*, 2015 WL 5432388, at *2 (E.D.Mich. July 22, 2015)(*citing Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir.1993))("'proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date'").  Thus, discussion of the records predating Plaintiff's October 17, 2014 application are included for background purposes only.

"varying degrees of neural foramina compromise and facet arthritic changes" (Tr. 342).   In November, 2013, Dr. Mazhori noted that Plaintiff now reported level "seven" pain on a scale of one to ten (Tr. 337).

In January and February, 2014, Plaintiff reported bilateral pain, numbness, tingling in the lower extremities, and nighttime sleep disturbances due to pain (Tr. 326, 329, 333). March, 2014 records note that Plaintiff developed scar tissue following the laminectomy (Tr. 324).   A July, 2014 x-ray of the right knee performed in response to Plaintiff's report of "acute chronic pain" showed moderate right knee osteoarthritis which had progressed from 2009 studies (Tr. 292).   Plaintiff was referred for physical therapy for the right knee and right foot (Tr. 302).

January, 2015  records note Plaintiff's report of stabbing, severe low back, and left leg pain (Tr. 312).   Treating records note that Plaintiff exhibited an antalgic gait (Tr. 312-314).   An MRI from the next month showed "stable post-surgical changes with scar tissue "around the right S1 nerve root (Tr. 316).

May, 2015 psychological intake records note Plaintiff's report of sleep disturbances, anxiety, poor concentration, forgetfulness, mood swings, and irritability since the 2004 car accident (Tr. 367).  She was diagnosed with major depression exacerbated by back pain, foot surgeries, and financial stressors (Tr. 369).  Plaintiff reported ongoing sleep disturbances due to pain (Tr. 374). Physical treating records from the same month note Plaintiff's report of level "ten" pain on a scale of one to ten (Tr. 538).   She reported 30 to 50 percent

improvement in symptoms with surgery; 10 to 30 percent relief with heating pads/ice packs; but zero relief from either physical therapy or chiropractic treatments (Tr. 538).

In July, 2015, Plaintiff underwent a lumbar interbody fusion at L5-S1 (Tr. 622).  The same month, Plaintiff sought post-surgical emergency treatment for bilateral lower back pain (Tr. 597).   Records by James G. Tyburski, M.D. from seven days after the emergency treatment note that "back pain . . . remarkably resolved" since surgery (Tr. 594).   Imaging studies of the spine showed mild facet arthropathy at L4-L5 and L5-S1 (Tr. 588).   Treating records from the same month note Plaintiff's report of "activity . . . back to pre-operative level" (Tr. 501).  Later the same month, plaintiff reported lower back and leg pain at a level "seven" with the use of pain medication (Tr. 492).  In September, 2015, Plaintiff reported level "eight" pain despite the use of Morphine (Tr. 473, 478-480).   October, 2015 psychological therapy records note "minimal" mental health progress due to Plaintiff's recent back surgery (Tr. 375).  In November, 2015, Plaintiff reported level "ten" pain without morphine and "five" with morphine (Tr. 468).  The following month, she reported level "ten" pain with or without medication (Tr. 458).  Also in December, 2015, Plaintiff reported lower abdominal pain due to scar tissue related to a lower abdomen incision (Tr. 630, 650).  A CT showed an umbilical hernia with a mentral scar (Tr. 658).

In January, 2016, Plaintiff reported level "eight" pain with medication and "ten" without (Tr. 443).  The same month, Plaintiff underwent surgery for abdominal wall hernia repair for "an obvious ventral hernia"  (Tr. 644, 661).  Treating records  note the presence

of scar tissue resulting from the previous fusion surgery (Tr. 425). The following month, she reported, at best, level "seven" pain (Tr. 433). In March, 2016, Plaintiff reported infection and drainage at the site of the surgical incision (Tr. 652). In April, 2016, a treating source opined that Plaintiff's "level of pain relief [was] not adequate" (Tr. 427). An April, 2016 MRI of the lumbar spine showed only "mild bilateral neuroforaminal narrowing at L4-L5" (Tr. 559). Treating comments state that EMG studies of the bilateral lower extremities from the same month were negative for lumbar radiculopathy or peripheral neuropathy (Tr. 553). However, at another place in the medical transcript, the same source on the same day states that the results of nerve conduction studies were "consistent with lumbar radiculitis" conclusion made nerve conduction studies from the same day by(Tr. 419). In April and May, 2016, Plaintiff was administered epidural steroid injections for "lumbar postlaminectomy syndrome" (Tr. 407, 608). June, 2016 records note Plaintiff's report of level "seven" pain with medication and level "ten" without (Tr. 391).

### 2. Non-Treating Sources

In April, 2015, Cheryl D. Lerchin, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's history of a right foot fracture with three surgical procedures, chronic low back pain wit lumbar surgery, and chronic knee pain with arthritic changes (Tr. 360). Dr. Lerchin noted that an October, 2013 MRI showed a disc protrusion and "varying degrees of neuroforaminal compromise" with arthritic changes (Tr. 261).

Dr. Lerchin observed an antalgic but stable gait, heel and toe walking, and full orientation (Tr. 361). Plaintiff exhibited 5/5 strength but decreased sensation in the light-sided L5-S1 distribution (Tr. 361). Plaintiff exhibited a limited range of lumbar spine motion (Tr. 361). Dr. Lerchin concluded that Plaintiff's ability to bend and twist was limited and that Plaintiff was unable to lift more than 20 pounds or engage in prolonged standing or long distance ambulation (Tr. 361).

The same month, Shelley Galasso Bonanno, M.A., under the direction of psychologist Lisa Silverman, Ph.D., performed a consultative psychological evaluation on behalf of the SSA, noting Plaintiff's report of depression resulting from her physical limitations since the 2004 car accident (Tr. 353-354). Plaintiff reported that she no longer took psychotropic medication due to side effects (Tr. 354). Plaintiff appeared cooperative but reported that she did not like to be around "too many people" (Tr. 354). She reported that she watched television most of the day and used a motorized cart to grocery shop (Tr. 355). Plaintiff exhibited adequate contact with reality but poor self-esteem (Tr. 356). Her stream of mental activity was organized with relevant speech and no unusual ideation (Tr. 356). She appeared depressed but fully oriented (Tr. 357). Bonanno noted the diagnoses of somatic symptom disorder, depression, anxiety, and Post Traumatic Stress Disorder ("PTSD") with a guarded prognosis (Tr. 358).

The same month, Leonard C. Balunas, Ph.D performed a non-examining review of the treating and consultative records on behalf of the SSA, finding that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 90).

### C.  Vocational Expert Testimony

VE Judith Findora   classified Plaintiff's former jobs as a machine operator as unskilled and exertionally medium (light as performed) and fast food worker and visual inspector as unskilled/light[3] (Tr. , 72-74, 227).

The ALJ then posed the following set of restrictions, describing a hypothetical individual of Plaintiff's age, education, and work history:

> [T]his hypothetical individual can work at the light exertional level, lifting twenty pounds occasionally and ten pounds frequently . They can sit for six of eight hours. But they can only stand or walk for four. They can frequently use foot controls. They can only occasionally climb stairs or ramps. Never climb ladders, ropes, or scaffolds. They can frequently stoop, but only occasionally kneel, crouch, or crawl. Additionally this person is limited to simple and routine tasks where there are few changes in the workplace. And they cannot interact with the public but they can interact with supervisors and coworkers occasionally. . . . [C]an this hypothetical individual perform the claimant's past relevant work? (Tr.74-75).

---

[3]

20 C.F.R. §§ 404.1567(a-d), 416.967(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

The VE testified that the above-described individual would be unable to perform Plaintiff's past relevant work but could perform the light, unskilled work of a sorter (30,000 positions in the national economy); administrate support clerk (170,000); and bench assembler (Tr. 99,000) (Tr. 75). The VE stated further that if the same individual were limited to sedentary work involving lifting a maximum of 10 pounds occasionally" and "negligible amounts frequently," but "could still frequently use foot controls, occasionally climb stairs and ramps, never ladders, ropes, or scaffolds[;] frequently stoop, but only occasionally kneel, crouch, or crawl;" and could perform "simple routine tasks, few changes, no public, and occasional supervisors and coworkers," the individual could perform the sedentary work of an administrative support clerk (sedentary) (197,000), packer (65,000), and bench assembler (sedentary) (33,500) (Tr. 76).

The VE testified that the need to leave the work site for more than 20 percent of the day would be work preclusive and that reclining on the job or falling asleep were "not allowable even in smaller increments" (Tr. 76). The VE stated that the need to miss more than one day a month would be work preclusive (Tr. 76). She concluded by stating that her testimony was consistent with the information in the *Dictionary of Occupational Titles* ("*DOT*"), adding that the considerations of time off task and absenteeism was not covered by the *DOT* (Tr. 77).

**D.    The ALJ's Decision**

Citing Plaintiff's treating records, ALJ Herring determined that Plaintiff experienced the severe impairments of "degenerative joint disease of the right knee; degenerative disc disease of the lumbar spine status post L5-Sl anterior lumbar interbody fusion; status post history of right foot surgery; anxiety and depression " but that none of the impairments met or equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 20-21). Noting the absence of a fibromyalgia diagnosis in the medical transcript, she found that the condition was not a medically determinable impairment (Tr. 20-21). The ALJ found mild restriction in activities of daily living and moderate limitation in social functioning and concentration, persistence or pace (Tr. 21). She found that Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:

> [S]he can sit for six of eight hours but she could only stand or walk for four; she can frequently use foot controls; she can only occasionally climb stairs or ramps but never climb ladders, ropes, or scaffolds; she can frequently stoop but only occasionally kneel, crouch, or crawl; she is limited to simple and routine tasks where there are few changes in the workplace; and she cannot interact with the public, but the claimant can interact with supervisors and coworkers occasionally.(Tr. 22).

Citing the VE's findings (Tr. 75), the ALJ found that Plaintiff could perform the exertionally light work of a sorter, administrative support clerk, and bench assembler (Tr. 28).

-12-

The ALJ discounted the allegations of disability, noting that Plaintiff continued to smoke despite occasional shortness of breath and the detrimental effects to her overall health (Tr. 23). She cited the "opinion evidence" of "face-to-face" SSA field examiner who observed no problems "hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, and writing" (Tr. 23). The ALJ acknowledged that the examiner interviewed Plaintiff prior to her back surgeries (Tr. 23). The ALJ accorded only "some weight" to an April, 2015 psychological consultative examination showing some degree of concentrational limitation (Tr. 23-24). The ALJ adopted the findings of a consultative physical examiner from the same month on the basis that they were consistent with Plaintiff's "longitudinal treatment records as a whole" (Tr. 24).

The ALJ cited post-laminectomy records from 2015 showing an improvement in Plaintiff's back and leg condition (Tr. 25). She noted that an April, 2016 EMG study of both lower extremities was normal (Tr. 25). She cited steroid injection records showing that Plaintiff was negative for back pain, joint pain, joint swelling, muscle weakness and neck pain (Tr. 26 *citing* 386). She observed that the consultative physical examiner noted an "'antalgic, although stable gait'" and that Plaintiff did not require an assistive device (Tr. 26 *citing* 361).

### III. STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual

determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted). The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. *Biestek* at 1152; 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*). Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)). However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.

-14-

*Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Her v. Commissioner of Social Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999).

## V. ANALYSIS

### The ALJ's Evaluation of the Subjective Symptoms

In her sole argument for remand, Plaintiff faults the rejection of her professed allegations of disability.  ECF No. 10, PageID.714 (*citing* SSR 16-3p, 2016 WL 1119029

(Mar. 16, 2016)).[4]

SSR 16–3p sets forth the standard for evaluating the alleged limitations using a two-step process. 2016 WL 1119029, at *3 (Mar. 16, 2016). First, the ALJ determines whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the alleged pain or limitation. *Id.* Here, ALJ Herring satisfied the first prong of 16-3p by acknowledging that the conditions of degenerative joint disease of the right knee; degenerative disc disease of the lumbar spine , status post history of the right foot surgery, anxiety and depression caused significant work-related limitations (Tr. 20). Plaintiff does not dispute these findings.

Second, the ALJ must evaluate claims of limitation not reflected in the objective evidence. SSR 16-3p at *3-4. The ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources

---

[4]

In contrast to a recently rescinded ruling regarding the evaluation of the subjective symptoms, (SSR 96-7p), SSR 16-3p eliminates the use of the term "credibility" from SSA policy. 2016 WL 1119029, at *1. The Ruling states that "subjective symptom evaluation is not an examination of an individual's character." Instead, ALJs are directed to "more closely follow [the] regulatory language regarding symptom evaluation." *Id.*; *See* 20 C.F.R. §§ 404.1529, 416.929. However, "the implementation of SSR 16-3p did not abrogate the substantial case law pertaining to credibility evaluations under SSR 96-7p." *Boles v. Commissioner of Social Sec.*, 2019 WL 5897920, at *7 (M.D.Tenn.,Nov. 12, 2019)(*citing Dooley v. Commissioner of Social Sec.*, 656 F. App'x 113, 119, n.1 (6th Cir. July 28, 2016)("SSR 16-3p removed the term 'credibility' only to 'clarify that subjective symptom evaluation is not an examination of an individual's character'").

-16-

and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. In addition to an analysis of the medical evidence, 20 C.F.R. §§ 404.1529(c)(3), 416.929 list the factors to be considered in making a credibility determination:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

In other words, the ALJ must consider whether the record as a whole reflects the claimant's professed degree of limitation.

Plaintiff argues primarily that the ALJ did not consider her limitations as a result of medication side effects.  To be sure, the record shows that Plaintiff alleged medication side effects (Tr. 427, 433, 437).   However, the requirement that the ALJ consider allegations of medical side effects does not mandate their explicit mention in the written decision.  *See French v. Commissioner of Social Sec.*, 2016 WL 3951419, at *13 (E.D.Mich. June 30, 2016)(Morris, M.J.); *adopted,* 2016 WL 3924111 (E.D. Mich. July 21, 2016).  Moreover, the RFC limiting Plaintiff to unskilled, simple, and routine tasks with "few changes in the workplace" adequately accounts for her moderate concentrational limitations brought on by either psychological conditions or the effects of medication (Tr. 22).  *See Smith-Johnson v. Commissioner of Social Sec.*, 579 Fed. Appx. 426, 437, 2014 WL 4400999, *10 (6th Cir. September 8, 2014)(moderate concentrational limitations adequately addressed by restricting

the claimant to unskilled, routine, repetitive work).

More generally however, the record shows that the ALJ failed to adequately consider or articulate the allegations of limitation.    In support of the finding that Plaintiff could perform exertionally light work, the ALJ determined that the allegations of limitation were undermined by Plaintiff's failure to quit smoking (Tr. 23).  It is well settled that Plaintiff's choice to continue smoking against medical advice can be used to undermine her allegations of limitation. *Sias v. Secretary of Health and Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).  However, it is unclear how Plaintiff's failed attempts to quit smoking  (Tr. 53-54) significantly undermine her disability claims given that her application for benefits does  not allege disability or limitation due to respiratory problems.   While smoking cessation would certainly improve Plaintiff's  overall health,  none  of the  treating records  support  the conclusion that the injury-related spine and foot problems,  failed laminectomy,  interbody fusion, and the need for additional corrective surgery to repair scar tissue were attributable in whole or part to smoking.  In this case, the fact that Plaintiff smoked cannot be used to undermine her allegations of disability due to injuries suffered in a car accident followed by multiple, unsuccessful surgeries.

While ALJ cited  a SSA field examiner's November, 2014 observation that Plaintiff did not experience problems walking during an interview, this evidence predates the evidence from January, 2015 and the ensuing complications resulting from the July, 2015 surgery (Tr. 23).  Indeed, the ALJ properly acknowledged  that the interview was conducted prior to a

July, 2015 corrective interbody fusion surgery (Tr. 23).[5] *See Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 409 (6ᵗʰ Cir. 2009)(Credence given to earlier opinion evidence must reflect consideration of the subsequently created evidence).

In support of the finding that Plaintiff could perform a range of light work, the ALJ stated that she relied heavily on Dr. Lerchin's April, 2015 consultative findings (Tr. 26). However, the purported "adoption" of those findings in support of the RFC for light work warrants a remand for further review.    The ALJ cited Dr. Lerchin's opinion that Plaintiff was restricted from "prolonged standing or long distance ambulation" due to the back, knee, and foot problems (Tr. 24, 25-26 *citing* Tr. 361).    However, the RFC crafted by the ALJ requires up to four hours of walking or standing everyday does not include a sit/stand/walk option limiting walking or standing to certain intervals, *i.e.*, 30 , 15, 10 minutes.  It does not follow that Dr. Lerchin's preclusion on "long distance ambulation" supports the RFC requiring up to four hours walking in an eight-hour period (Tr. 22).[6]

Aside from the fact that Dr. Lerchin's observations do not support the conclusion that Plaintiff could walk for four hours a day, the treating records from July, 2015 forward

---

[5]

The ALJ did not assign a specific weight the field examiner's but it appears that she adopted his findings as to Plaintiff's cognitive and concentrational abilities but discounted his finding as to the physical limitations based on the later surgeries.

[6]

The Court is mindful of the VE's testimony that a significant number of *sedentary* jobs existed allowing for only two hours of walking or standing each day (Tr. 75-76). However, Dr. Lerchin's finding that Plaintiff was unable to perform prolonged walking would not support an RFC requiring her to walk uninterrupted for up to two hours in an eight-hour workday.

contain little support for the light RFC.   The ALJ's discussion of the records from October, 2014 to July, 2015 fusion surgery acknowledge that Plaintiff exhibited an obvious limp at a January, 2015 appointment and that the imaging and neurological studies from the same period support Plaintiff's claims (Tr. 24).   However, the ALJ's selective citation to records in the months following the July, 2015 surgery in support of the finding that Plaintiff could perform light work do not represent the great weight of evidence from that time forward (Tr. 25 *citing* Tr. 501, 594).   While the ALJ cites Plaintiff's February, 2016 statement that she felt better with treatment, the vast majority of these records show that Plaintiff experienced significant ongoing symptomology.

For example, the ALJ cited a February, 2016 statement by a treating source that Plaintiff's "daily function" had "increased" since starting treatment (Tr. 25 *citing* Tr. 437). However, the treating source does not offer a point of comparison for the "increase" in functioning.  Further, the same treating narrative includes the observation that Plaintiff's pain was worsened by "sitting, standing, traveling, and walking" and that she continued to experience level "seven" pain (Tr. 437).   The treating records from this period show that pain resulting from scar tissue warranted followup surgery and that Plaintiff required treatment for a serious postoperative infection following that surgery.   Likewise, while the ALJ cited a July 15, 2016 "review of systems" checklist stating that Plaintiff was negative for back pain and joint pain  (Tr. 26 *citing* 386), the checklist wholly contradicts the physician's narrative summation of the same examination which notes  "sharp, shooting, aching and stabbing" leg

-20-

pain exacerbated by all exertional activities, postural changes, and activities of daily living (Tr. 384). The examination notes from the July 15, 2016 appointment cannot be read to conclude that Plaintiff no longer experienced significant pain.

While Plaintiff's initial post-July, 2015 surgical evaluations suggest that her condition was resolved, the subsequent records overwhelmingly indicate otherwise. One month after the surgery, Plaintiff reported level "seven" pain with the use of medication and the following month repeatedly reported level "eight" pain with the use of morphine (Tr. 473, 478-480). In December, 2015, she reported level "ten" pain with or without the use of medication (Tr. 458). Plaintiff's report of continued, extreme pain is supported by a CT examination from the same month showing an "obvious" hernia with scar tissue related to the July, 2015 fusion surgery (Tr. 630, 644, 650-651, 658). Plaintiff's claim of ongoing pain is also supported by the fact that yet another "followup" surgery was performed in January, 2016 for accumulated scar tissue from the July, 2015 procedure (Tr. 425). If this were not enough to document that Plaintiff's potentially disabling problems continued past July, 2015, the treating records show in March, 2016, she required treatment for an infection with drainage from the July, 2016 surgery (Tr. 652).[7]

---

[7]

Even if it could be plausibly argued that Plaintiff's condition improved following the March, 2016 treatment for the post-surgical infection, the records created between January, 2015 and March, 2016 strongly support the finding that she experienced disability level limitation for a period of at least 12 months. "In determining whether [a claimant] is entitled to disability benefits, it is also necessary to consider every [12-month] period during which Plaintiff may have been disabled" *Pena v. Barnhart*, 2002 WL 31487903, *11 (S.D.N.Y. October 29, 2002); 42 U.S.C. § 423(d)(1)(A).

In short, substantial imaging and clinical evidence for the relevant period shows that Plaintiff experienced ongoing and significant symptoms resulting from (1) the underlying back pain confirmed by the imaging studies (2) the failed laminectomy requiring followup fusion surgery, (3) the third surgery for scarring, and (4) complications from the scar tissue removal surgery. Notwithstanding the weight generally accorded the ALJ's evaluation of the subjective allegations, *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir. 2007), in this case the ALJ's rationale for discounting Plaintiff's claims relies on a myopic, if not distorted account of the evidence.

In a related matter, I note that the ALJ cited an April 18, 2016 EMG study showing no abnormalities of the lower extremities (Tr. 25 *citing* Tr. 553). The ALJ correctly cited the conclusions set forth on this page of the transcript. However, my own review of the records reveals a contradictory conclusion made on the same day by the same source stating that "7-8 nerve conduction studies" performed were "consistent with lumbar radiculitis" (Tr. *compare* 419, 553). To be sure, it is well-settled that the ALJ is not required to discuss every piece of evidence to support the denial of a disability claim. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. February 9, 2006)("ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."). However, the ALJ's reliance on the records showing "no abnormalities" to support the RFC for light work, without acknowledgment of the apparently contradictory findings from the same day by the same source, at a minimum requires further review. If anything, the

-22-

diagnostic testing consistent with the condition of lumbar radiculitis lends further credence to Plaintiff's July, 2016 report of ongoing, "sharp, shooting, aching and stabbing" bilateral leg pain (Tr. 384).

For these reasons, a remand is required for reconsideration of the exertional requirements stated in the RFC, acknowledgment of the April 18, 2016 neurological studies, and consideration of whether the record supports an award of benefits for any 12-month period within the relevant period. Notwithstanding that the non-disability determination does not accurately reflect the record, an award of benefits is premature. A remand for an award of benefits is appropriate "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Accordingly, I recommend a remand for further administrative proceedings consistent with the above findings.

## VI. CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment or Remand [Docket #10] be GRANTED to the extent that the case be remanded to the administrative level for further proceedings consistent with this report. I recommend that Defendant's Motion for Summary Judgment [Docket #11] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR

72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R. Steven Whalen
R. STEVEN WHALEN
United States Magistrate Judge

Dated: May 4, 2020

-24-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on May 4, 2020 electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager